# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| SHIRLEY A. ROE, | : | |
| Plaintiff, | : | Case No. 3:04CV429 |
| vs. | : | District Judge Walter Herbert Rice |
| | | Magistrate Judge Sharon L. Ovington |
| ESTÉE LAUDER COMPANIES, INC., | : | |
| Defendant. | : | |

# REPORT AND RECOMMENDATIONS[1]

## I.    INTRODUCTION

Plaintiff Shirley A. Roe brings this employment-discrimination case against her employer,

Defendant Estée Lauder Companies, Inc.[2]  Roe's Complaint raises four Counts:

> I.    Defendant discriminated against her on the basis of her race in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e, *et seq*. ("Title VII"), and in violation of 42 U.S.C. §1981 and various Ohio statutes;

> II.    Defendant subjected her to a racially hostile work environment and retaliated against her in violation of Title VII, 42 U.S.C. §1981, and various Ohio statutes;

> III.    Defendant's actions constituted one or more breach of contracts between Plaintiff and Defendant; and

> IV.    Defendant's racially discriminatory actions, and its other actions set forth in the Complaint, violated public policy.

This case is before the Court upon Defendant's Motion For Summary Judgment (Doc. #17),

---

[1]  Attached hereto is a NOTICE to the parties regarding objections to this Report and Recommendations.

[2]  Plaintiff originally brought his case through counsel, who was later permitted to withdraw.  She now proceeds *pro se*.

Roe's Response and additional Exhibits (Doc. #s 26, 28, 31-32, ), Defendant's Reply (Doc. #36),

Roe's Supplemental Information (Doc. #39), and the record as a whole.

## II.     FACTUAL BACKGROUND

### A.     Defendant's Business and Roe's Employment

Defendant and its affiliated companies are in the business of selling a variety of skin care,

cosmetic, and fragrance products to members of the armed services and their families.  Defendant

sells its products at cosmetic counters located on military bases including Wright Patterson Air

Force Base ("WPAFB") in Ohio.

Defendant's business operation at WPAFB includes at least two cosmetic counters: one

containing Estée Lauder products, the other containing Clinique products.  Clinique is one of

Defendant's affiliated companies.  Defendant employs counter managers and beauty advisors, who

maintain stock, consult with customers, and do make-overs for customers.

Plaintiff Roe, an African-American woman, began working for Defendant as a counter

manager at WPAFB on October 9, 2000.  Roe acknowledged during her deposition that she was an

at-will employee and that either she or Defendant could terminate her employment at any time.  (Roe

deposition, pp. 40-41).

At the time she was hired, Roe signed four documents: (1) a Confidentiality, Trade Secret

and Work Products Agreement; (2) an Employee Certification concerning electronic surveillance;

(3) a Consumer Credit Report Disclosure and Authorization Form; and (4) Defendant's Code of

Corporate Conduct.  (Roe depos., Exhibit 2).  Roe also received a letter from Defendant stating that

she had been hired as a counter manager at WPAFB to work approximately 30 hours per week at

the rate of $12.00 per hour.  *Id.*  Roe understood that this letter did not guarantee her 30 hours per

week of work.  (Roe depos., p. 43).

### B.    Roe's Job Interview and Initial Employment

During her job interview, Defendant's account executive Meagan Brown told Roe that her job duties would include maintaining the Estée Lauder counter and helping customers locate products at the Clinique counter.  (Roe depos., pp. 45-46).  According to Roe, Brown also stated "that it was not [Roe's] job to do Clinique."  *Id*. at 46.  Roe thus understood that she was responsible for helping customers find products at the Clinique counter, but that she was not required to perform consultations with Clinique customers or do make-overs upon Clinique customers.  *Id*. at 46-47.

Brown also told Roe that it would not be her job to stock Clinique products, although Roe acknowledges that Brown did not tell her that she would never have to do stock work for Clinique. *Id*.

Shortly after Defendant hired Roe, she was provided with a written description of her job duties as counter manager.  This job description required her to, among other things, "promote good working relationships among Beauty Advisors and with the Cosmetics Department and Exchange"; supervise beauty advisors and counter activities; encourage cooperative teamwork; keep shelves stocked, neat, and clean; and coordinate special events.  (Roe depos., Exh. 3).

In August 2001, Roe requested and received a promotion to the position of business manager.  When asked during her deposition why she requested this promotion, Roe answered:

> Because the Estée Lauder Company fired the Clinique counter manager, and Meagan Brown had me going over ... doing work over in Clinique when there was no one over there, and I got no additional pay to go in the Clinique counter, so I requested the business manager position....

(Roe depos., p. 59).

The work Roe performed at the Clinique counter included putting away stock, doing paperwork, faxing documents, and counting the Clinique products in stock.  *Id*. at 60.

Roe does not contend that Defendant failed to pay her for the total number of hours she worked.  She, however, contends that she was entitled to additional pay, which she did not receive, for the work she did at the Clinique counter.  For example, if Roe worked 30 hours a week, then Defendant paid her for this 30 thirty hours of work without providing her additional pay for any Clinique work she performed during this 30 hours.  *Id*. at 60-63.  Roe also acknowledges that Defendant did not reduce her pay for any time she spent performing Clinique work.  *Id*. at 63.

When Roe began in the position of business manager, Defendant intended to hire both a fifteen-hour beauty consultant and a thirty-hour beauty consultant.  *Id*. at 65, 68-69.  In November 2001, Brown informed Roe that Defendant would not be hiring a thirty-hour consultant and that the fifteen-hour consultant would be doing most of the work.  *Id*. at 68-69.  At this point, Roe believed that she would be performing the work of the thirty-hour consultant.  *Id*. at 69-70.  She explains:

> Well, the fifteen-hour person did her share, but I knew then that if she [Brown] was not going to hire the thirty-hour person, then it was up to me to make sure that the labor ... was done, so I had to assign the fifteen-hour person to do some of the labor also, which she didn't want to do.

*Id*. at 70.

In November 2001, Roe asked to be returned to her position as counter manager, because Defendant did not hire a thirty-hour per week consultant.  *Id*. at 70-72.  Roe remained the business manager until January 2002 when Defendant hired a Clinique counter manager.  At this point, Roe returned to the position of Estée Lauder counter manager.  *Id*. at 72-74.

During the time when Roe was the business manager, sales decreased at both the Clinique and Estée Lauder counters, although Roe was not told this until after she asked to return to the

position of counter manager.  *Id*. at 70-71.

### C.    <u>Roe's Stumble</u>

On approximately June 28, 2002, Roe almost fell down some stairs at work while carrying

a box of Estée Lauder make-up sets.  She described this incident as follows:

> I stumbled on the stairs and I had a box in my hand, and ... I was going down
> the stairs with the box, this was to do something for our Estée Lauder counter for a
> customer, and this was after I assisted in Clinique, and I became faint and dizzy and
> ill and I stumbled on the stairs, and I knew at the time when I had the box in my
> hand, which was not heavy, it was either me or the box because I couldn't hold on
> to the rail with the box in my hand.

(Roe's depos., p. 160).  Roe did not injure herself in this stumble.  *Id*. at 160, 166.

Roe testified that she nearly fell because she was stressed from assisting the Clinique counter

manager with Clinique stock for about thirty minutes.  She explains, "well, it wasn't my job to do

the Clinique.  I did not agree at the time of hire to assist Clinique with putting away their stock, and

I have a lot of products myself with Estée Lauder counter to do, and we had also received stock that

same day."  *Id*. at 161-62.  By this time, both Brown and Defendant's regional marketing director

Ann Lanham had instructed Roe to help put away Clinique stock.  *Id*. at 162-63.

Roe reported her near fall to Brown and to the WPAFB Exchange Manager.  In early July

2002, Brown and Lanham spoke with Roe, who describes the discussion as follows:

> [T]hey still wanted me to assist in Clinique with labor, to my knowledge, and
> some other changes.
>
> She [Lanham] said that was to take place, and I ... mentioned to her did she
> hear about the incident, did they get my message about what had happened on the
> stairs, and she replied that she did, and that's when she told me ... that I planned to
> fall down the stairs to get out of doing Clinique.

*Id*. at 170-71.  In response, Roe calmly said that she felt Lanham did not care about what had

happened to her, and she asked Lanham, "why would I plan to fall down the stairs to possibly break my neck or any other parts of my body." *Id*. at 171.  According to Roe, Lanham responded that she did care, and she also said that it was dumb to carry a heavy box down the stairs.  When Roe then asked Lanham if she was calling Roe dumb, Lanham "said no but use some common sense..." *Id*. at 172.  Roe testified:

> She [Lanham] said I should have left the box at the top of the stairs, and to me, she smirkingly said that – or sarcastically, to me, that's how it appeared – that I should have taken each set out of the box one by one and brought them down the stairs and go back up the stairs and get the other one and bring the other one down until they were all in the cart.

*Id*. at 172.

### D.    <u>August through November 2002</u>

In August 2002, a WPAFP Exchange manager informed Roe about a customer complaint in which the customer accused Roe of telling him, "if you're not buying, you're not going to get help." (Roe depos., pp. 267-68).  Roe testified during her deposition that she did not make this statement. *Id*.  Roe told Brown about this customer complaint.  Brown instructed Roe to document it, which she did in a letter, which included her denial that she made the statement to the customer.  *Id*. at 268-69.

Also in August 2002, Roe and Kathy, an employee of WPAFB Exchange, exchanged words. Roe testified:

> Kathy approached me and she was waving her finger in my face, and she said something to the fact that she didn't care about what I thought or how she treated me ... and I felt threatened at that time when she approached me, and she told me to take a look at myself in the mirror....

*Id*. at 250.  Roe felt that this was a racist comment, "[b]ecause when you look at yourself in the

6

mirror, the first thing you see is who you are, your – your image....  You can't see on the inside of you, so you see on the outside of you...."  *Id*. at 256.

Roe never saw Kathy treat anyone else like this.  *Id*.  Roe sent a letter to the General Manager of WPAFB Exchange describing this incident and reporting racial harassment.  (Doc. #17, Exh. G).  Roe, however, does not specifically recall informing Brown or Lanham about this incident. (Roe's depos. at pp. 251-52).

In September 2002, the Clinique counter manager resigned.  Both Roe and Nanette Rock, an Estée Lauder part-time beauty advisor, helped maintain the Clinique counter.  Brown instructed Roe and Rock to do the same things at the Clinique counter they were doing at the Estée Lauder counter.  *Id*. at 314-15.  This situation existed for about six weeks in September and October 2002.

Also in September 2002, Roe injured her wrist while putting away Clinique stock.  She was lifting a box when her wrist popped.  *Id*. at 333.  Roe went to the emergency room at WPAFB, where two physicians told her that she had an overuse injury.  *Id*.; *see also* Roe's depos., Exh. 16 at 17-18.

In early November 2002, a new Clinique counter manager, Anita Powell, was hired.  (Roe's depos. at 325).

Roe testified during her deposition that Brown did not give her credit for working at the Clinique counter during September and October 2002.  *Id*. at 316.  In November 2002, Roe read a note written by Brown praising Anita Powell for the fact that the Clinique counter achieved its October 2002 sales goal.  (Roe depos. at 317 and Exhs. 17-18).  Roe was hurt by this because credit was given to Powell, rather than Roe (or Rock) for the October 2002 sales achievement despite Roe's Clinique work in September and October 2002 and even though Powell was not working for Defendant in October 2002.  *Id*.

7

Roe received a yearly job performance review on November 21, 2002. *Id*. at 233 and Exhibit 12. The timing of this upset Roe for three reasons. First, she thought the yearly review should have occurred in October 2002 since she had been told that her performance reviews would occur yearly in October. Second, Nanette Rock, her beauty advisor, had received her performance review in October 2002. Third, at some point Brown had informed Roe that her performance review would not occur until January 2003 because Brown had not received paperwork from human resources concerning Roe's yearly performance review. (Roe's depos., pp. 233-34, 312-14). Roe explained, in part, during her deposition as follows:

> I felt it would have been fair – it would have been fair. I did the work. For that whole year, I worked in two areas that whole – during that time, you know, helping out in Clinique, and when the rep left ... Clinique in September, I was doing the work over there and I was doing Estée Lauder [work], so I felt that it was only fair to give me my review at that time that they gave my beauty advisor her review.

*Id*. at 313.

Roe thinks she discussed with Brown the fact that when she was hired, she had been told that her performance reviews would occur yearly in October. *Id*. at 313-14. Yet, Roe did not ask Brown to investigate whether her performance review should occur earlier than January 2003. *Id*. at 312.

Roe's November 2002 written performance evaluation, written by Brown, was less than positive, for the most part. (Roe's depos., Exh. 12 at 7). On the positive side, Brown wrote that Roe maintained a professional image, maintained a well-organized and clean working area, and completed paperwork in a timely manner. (Roe's depos., Exh. 12 at 3). On the less-than-positive side, Brown found that Roe did not take initiative in motivating staff to exceed goals, did not plan special events for Estée Lauder to build its business, did not balance time between paperwork and other tasks, and had "received a written customer complaint for poor customer service." *Id*. Roe

disagreed with these points.  *See id*.  Roe wrote on this form:

> I received a review and I felt that my review was base[d] on my relationship with WPAFB management, so every other area of my job is going to fall under certain situations regardless of what I do as a counter manager.  Also I feel that my complaint letter was a major factor.

*Id*. at 7.

Roe's reference to her complaint letter concerned a letter she had written in late October 2002.  Roe addressed her complaint letter to Andrew J. Cavanaugh, Senior Vice President of Global Human Resources.  (Roe's Depos., Exh. 16).  This lengthy letter described the ways that Roe felt Defendant had discriminated against her, including, but not limited to, the fact that her yearly performance review had not occurred in October 2002.  *See id*.  Roe generally noted in conclusion that she felt she had been discriminated against, harassed, humiliated, treated unfairly, deceived after reaching a verbal contract, treated unfairly in connection with her yearly review, and retaliated against.  *Id*. at 15.  She further wrote that she had treated Brown and Lanham with the utmost respect, even when she felt hurt due to their actions; that she loved working for Defendant; that she felt pressured to quit her job.  *Id*. at 16.  Roe concluded, "We are human beings and deserve to be treated equally and fairly."  *Id*.  And, she asked Cavanaugh, "Can you investigate this matter?"  *Id*.

### E.    Roe's Leave of Absence and Return to Work

On November 19, 2002, Roe saw a physician about her wrist injury.  (Roe's depos., p. 338). The physician wrote a note restricting Roe from lifting more than ten pounds with her left hand and twenty pounds with both hands.  *Id*.

On November 27, 2002, Roe experienced sudden pain in her wrist while at work when she pushed a cart.  *Id*. at 338-39.  On December 12, 2002, she went to a physician, who wrote a note

prohibiting her from lifting, cutting, and working with boxes.  (Roe's depos., Exh. 21).  The physician did not indicate in this note how long he believed Roe would have these restrictions. Brown therefore contacted the physician, who indicated that the restrictions were indefinite.  (Roe's depos., at pp. 340-41).

On December 16, 2002, Defendant placed Roe on a medical leave of absence.  Brown informed Roe about this decision and also informed Roe that she could return to work when the physician gave her the okay with no restrictions.  *Id*. at 344 and Exh. 22.

Roe was on leave from December 16, 2002 to August 4, 2003 when she returned to work for Defendant with no restrictions.  At this time, Roe was scheduled to work four to five hours per week less than she had previously worked, unless she was stocking inventory.  Brown told Roe that this reduction occurred because the counter's sales goals had not been met.  (Roe's depos., pp. 430-31, 436-37).  Part-time beauty advisor Nanette Rock's hours were also reduced at this time.  *Id*. at 438.

Lanham states in her affidavit that Roe's hours were reduced "because the Estée Lauder counter had failed to reach its sales goals in the months prior to Ms. Roe's return.  The hours of Nanette Rock ... were reduced as well.  Both employees' hours were reduced so that Estée Lauder could stay within budget.  After Ms. Roe returned to work as counter manager and sales increased, Ms. Roe's hours were returned to approximately 30 hours per week."  (Doc. #17, Lanham affid. at ¶15).

Three months after Roe returned to work, Brown gave her a positive job performance evaluation for her work from August 4, 2003 to October 6, 2003.  (Roe's depos., Exh. 24 at 2-5). Brown wrote in part that Roe maintains a professional image, maintains a well-organized and neat counter, completes paperwork in a timely manner, completes weekly minutes and sends them to the

10

Account Executives weekly, and "converted the old counter in the new concept shop." *Id*. at 2. Brown's written evaluation of Roe's job performance concluded, "Commendable; meets and sometime exceeds expectations." *Id*. at 5. Defendant increased Roe's pay at this time by twenty-five cents an hour. (Roe's depos., p. 354).

Roe did not write any comments in the space indicated on her 2003 performance evaluation form. (Roe's depos., Exh. 24 at 5). Roe acknowledged during her deposition that she had improved her job performance in the areas Defendant was concerned about in her prior (2002) performance review. (Roe's depos., pp. 357-58). A note appears on the first page of Roe's 2003 performance evaluation, apparently written by Roe, indicating, "There is no mention of working in other areas in this Review, Clinique or other vendors areas. Will explain more in next meeting." (Roe's depos., Exh. 24, p. 2; *see* Roe's depos., pp. 352-53).

Roe filed a charge of discrimination with the Ohio Civil Rights Commission in December 2003 concerning the temporary reduction of her weekly hours when she returned to work in August 2003. (Roe's depos., pp. 430-31).

### F.    January 2004

On January 6, 2004, Lanham asked Roe and Anita Powell, the Clinique counter manager, to help each other with their work, including stock work. *Id*., 181, 183, 190-91. Both Roe and the Clinique counter manager objected to this. *Id*. at 194. Roe states, "We wanted to see documentation ... of any changes from the company saying that we are to assist in the Clinique area or Estée Lauder area doing labor work in each other's area." *Id*.

In response, Lanham gave Roe a copy of her job description. *Id*. at 195-96. Roe testified that Lanham did not discuss the job description with them. According to Roe, "she just handed us

11

the job description and Anita Powell mentioned that it's the same thing that we already have, and her and myself said we don't see anything different than what we already have, and it's not showing that we have to put away stock in each other's areas. It's not defined in that." *Id*. at 196. In response, Lanham directed Roe and Powell to have the beauty advisors help in each other's work area. *Id*. at 197. When Roe instructed Nanette Rock to help with the Clinique work, Rock refused. Roe did not tell Lanham about Rock's refusal because Roe did not feel it was Rock's job to help with the Clinique work. *Id*. at 198. Neither Roe nor Powell helped each other with stock. *Id*. No one reprimanded Roe or Powell or the beauty advisors for not doing this work. Lanham never stated that Roe's employment would be terminated if she refused to do this work. *Id*. at 198-99.

At some point before the January 6, 2004 meeting, the Clinique beauty advisor told Roe that she had received a two dollar per hour raise. *Id*. at 184. Roe believed this because the Clinique beauty advisor was white. *Id*. at 184-85. The topic of this purported raise came up during Lanham's meeting with Roe and Powell on January 6, 2004. Lanham informed Roe and Powell that the Clinique beauty advisor had not received a two dollar an hour raise but that she had received only a twenty cent per hour raise. *Id*. at 187-88. Roe did not believe Lanham because of how Lanham had treated her before this. *Id*. at 189.

## III.    SUMMARY JUDGMENT STANDARDS

A moving party is entitled to summary judgment in its favor if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc*. 477 U.S. 242, 247 (1986). To determine if a genuine issue of material fact exists, the Court accepts the nonmoving party's evidence as true and draws all reasonable inferences in the

nonmoving party's favor. *Matsushita Elec. Industrial Co., Ltd. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *see Little Caesar Enterprises, Inc. v. OPPCO, LLC*, 219 F.3d 547, 551 (6th Cir. 2000); *see also Holiday v. City of Chattanooga*, 206 F.3d 637, 642 (6th Cir. 2000). The Court's function is not to weigh the evidence to determine the truth of the matters asserted but to determine if there is a genuine issue of material fact for trial. *Anderson*, 477 U.S. at 249.

"The burden placed upon the movant for summary judgment is to show that the non-moving party has failed to establish an essential element of his case upon which he would bear the ultimate burden at trial." *Guarino v. Brookfield Tp. Trustees,* 980 F.2d 399, 403 (6th Cir. 1992); *see Hager v. Pike County Bd. of Education*, 286 F.3d 366, 370 (6th Cir. 2002). If the movant makes this showing, the nonmoving party may not rely on the bare allegations of the Complaint but must present affirmative or "significant probative evidence..." in support of his or her claims. *Chao v. Hall Holding Co., Inc*., 285 F.3d 415, 424 (6th Cir. 2002); *see Adams v. Metiva*, 31 F.3d 375, 379 (6th Cir. 1994); *see also Mitchell v. Toledo Hospital*, 964 F.2d 577, 582 (6th Cir. 1992). The purpose driving this requirement is that summary judgment is designed to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Lenz v. Erdmann Corp*., 773 F.2d 62, 66 (6th Cir. 1985)(citation omitted); *see Matsushita*, 475 U.S. at 587.

The Court is not required "to search the entire record to establish that it is bereft of a genuine issue of material fact." *Guarino,* 980 F.2d at 404; *see InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989); *see also Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989). Rather, the burden falls squarely on the nonmoving party to designate specific facts or evidence in dispute. *See Anderson*, 477 U.S. at 250; *see also Adams*, 31 F.3d at 379;

13

*Guarino*, 980 F.2d at 404-05; *Street*, 886 F.2d at 1479-80.

Ultimately, the Court must determine at the summary-judgment stage whether the evidence presents a sufficient disagreement to require submission of the challenged claim or claims to a jury or whether the evidence is so one-sided that the moving party must prevail as a matter of law.  *Anderson*, 477 U.S. at 251-52; *see Little Caesar Enterprises*, 219 F.3d at 551.

## IV.    ANALYSIS

### A.    Roe's Race Discrimination Claims Lack Merit

Defendant contends that it is entitled to summary judgment on Roe's race discrimination claims under Title VII, 42 U.S.C. §1981, and Ohio statutory law, because she cannot establish a prima facie case of race discrimination.  Roe contends that she can establish a prima facie case of discrimination.

The legal standards for analyzing Roe's claims of race discrimination under Title VII, §1981, and Ohio statutory law are essentially the same.  *See Noble v. Brinker Intern., Inc*., 391 F.3d 715, 720 (6th Cir. 2004).  A claim of race discrimination, like similar claims under §1981 and Ohio statutory law, requires evidence sufficient to show a prima facie case of discrimination. *Id*. (and cases cited therein).

**1.**
**Roe's Prima Facie Case – Adverse Employment Action**

To survive Defendant's Motion for Summary Judgment, Roe must produce either direct evidence of race discrimination or affirmative evidence in support of each element of a prima facie case of race discrimination.  *See Logan v. Denny's, Inc*. 259 F.3d 558, 566-67 (6th Cir. 2001); *see also Talley v. Bravo Pitino Restaurant*, Ltd. 61 F.3d 1241, 1246 (6th Cir. 1995).

Roe does not specifically assert that direct evidence supports her claim of race discrimination.  *See* Doc. 26 at 1-5.  She instead argues, for various reasons, that she can establish a prima facie case of race discrimination.  (Doc. #26 at 1-6).

To meet her burden of demonstrating a prima facie case of race discrimination, Roe must produce evidence indicating: (1) she is a member of a protected class; (2) she was qualified for her job and performed it satisfactorily; (3) despite her qualifications and performance, she suffered an adverse employment action; and (4) she was replaced by a person outside the protected class or was treated less favorably than a similarly situated individual outside her protected class.  *Logan v. Denny's, Inc.* 259 F.3d 558, 567 (6th Cir. 2001); *see Talley v. Bravo Pitino Restaurant, Ltd.*, 61 F.3d 1241, 1246 (6th Cir. 1995).

Defendant does not challenge the first and second elements of Roe's prima facie case. Given that Roe is an African-American woman, she satisfies the first element.  *See, e.g., Logan*, 259 F.3d at 567; *Noble*, 391 F.3d at 720; *cf. Johnson v. University of Cincinnati*, 215 F.3d 561, 573 (6th Cir. 2000) ("It is an established principle that Congress' primary concern in enacting the prohibition against racial discrimination in Title VII of the Civil Rights Act of 1964 was the plight of the African American in our economic society.").  Given her presently ongoing employment with Defendant along with her October 2003 job performance evaluation, she has produced sufficient evidence to show that she is qualified for her job and is satisfactorily performing it.  She therefore satisfies the second element of her prima facie case.

Defendant contends that Roe's race discrimination claim fails on the third element of her prima facie case because she cannot show that she suffered any materially adverse employment action in part.  Defendant emphasizes that it has neither terminated Roe's employment nor

15

demoted her, and that it has never decreased her salary.

Title VII does not prohibit all acts of discrimination.  It prohibits an employer from discriminating against an employee "with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race...."  42 U.S.C. §2000e-2(a)(1).  An act of discrimination effects a term, condition, or privilege of employment only if it was materially adverse to the employee.  *Hollins v. Atlantic Co., Inc*., 188 F.3d 652, 662 (6th Cir. 1999); *see Kocsis v. Multi-Care Management, Inc.*, 97 F.3d 876, 886 (6th Cir. 1996).

> [A] material adverse change in terms and conditions of employment must be more disruptive than a mere inconvenience or an alteration of job responsibilities.  A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.

*Hollins*, 188 F.3d at 662 (citation omitted).  Consequently, not every action that is arguably adverse to an employee violates Title VII.  "If every low evaluation or other action by an employer that makes an employee unhappy or resentful were considered an adverse action, Title VII would be triggered by supervisor criticism or even facial expressions indicating displeasure." *Primes v. Reno*, 190 F.3d 765, 767 (6th Cir. 1999).  The United States Court of Appeals for the Sixth Circuit "... has consistently held that *de minimis* employment actions are not materially adverse and, thus, not actionable." *Bowman v. Shawnee State University*, 220 F.3d 456, 462 (6th Cir. 2000).

Accepting Roe's deposition testimony as true and construing her assertions liberally in her favor does not reveal any indication that Defendant took a materially adverse employment action against her.  Roe's main claim, that Defendant required her to perform Clinique work

rather than only Estée Lauder work, does not show a materially adverse employment action.  At most, this constituted a *de minimis* alteration of her job duties from those Brown described to her during her job interview and those set forth in the written job description she was provided during her job interview.  Assuming – as Roe alleges – that she was not informed at the time of her hire that she would need to perform Clinique work, no reasonable jury could conclude that the Clinique work involved any new or additional job duties that were so onerous that they materially altered the conditions of Roe's employment.  What is plain from Roe's deposition testimony is that she did not want to do, and did not like doing, Clinique work.  What is absent from her testimony is any detail from which a reasonable jury could find anything more than *de minimis* change in her job duties.

Roe, moreover, does not allege that Defendant reduced or altered her pay or benefits in connection with the Clinique work or that Defendant did not pay her for the entire time she spent working on those days when she performed some Clinique work in addition to her Estée Lauder work.  She instead asserts that Defendant did not pay her additional money for her Clinique work.  This was not a materially adverse employment action because it is undisputed that Defendant paid Roe for her Clinique work by paying her for all the hours worked in any given workday.  There is also nothing in the record suggesting that Defendant promised Roe additional pay for performing Clinique work, the denial of which might then be considered a materially adverse employment action.  Instead, Roe acknowledges that no one ever told her that her job duties would never change.  (Roe's depos., p. 49).  And, Roe acknowledged during her deposition that her written job description does not state that her job will include only those duties listed therein or that Defendant would not change her job duties.  *Id*. at 58-59.

17

Roe's November 2002 job performance evaluation did not constitute a materially adverse employment action.  Although this evaluation was not altogether positive, it did not result in any reduction in pay or benefits and did not alter Roe's job duties.  The fact, moreover, that the evaluation occurred in November 2002 rather than October 2002 had no impact on Roe's pay or benefits or job duties.  Consequently, neither the substance nor the timing of Roe's November 2002 job performance evaluation evinces any materially adverse employment action.  *See Primes*, 190 F.3d at 767.

Roe was placed on medical leave in December 2002 without pay.  However, it is undisputed that Roe received worker's compensation during this period, which compensated her for her medical expenses as well as her lost pay.  (Roe's depos., pp. 345-46).  It is also undisputed that Roe's physician had prohibited her from cutting, lifting, or working with boxes, and that in December 2002, Brown told Roe that she could return to work when the physician gave her the okay with no restrictions.  (Roe depos, pp. 344-45).  Defendant returned Roe to her job as soon as her physician removed the work restrictions.  *Id*.  Because Defendant's actions were consistent with the physician's medical restrictions, and because Roe has not established that she incurred any uncompensated lost pay or benefits during this period, Defendant did not take a materially adverse employment action.  *See Coulson v. Goodyear Tire & Rubber Co*., 31 Fed. Appx. 851, 854 (6th Cir. 2002) ("Goodyear's requirement that Coulson take medical leaves did not constitute an adverse employment action.").

Roe's next potential materially adverse employment action concerned the temporary reduction of her work hours when she returned to work in August 2003.  This, however, was merely a *de minimis* reduction in pay because it merely reduced her pay by five hours per week

18

until the Clinique sales increased.  Roe has not presented evidence indicating how much this actually reduced her pay or for how long.  Because it is undisputed that this was a temporary reduction, Roe has not met her burden at the summary-judgment stage of producing affirmative evidence sufficient to show that this temporary reduction constituted a materially adverse employment action.

Roe has not established that Defendant took an adverse employment action against her after October 2003.  Instead, it is undisputed that she received a positive job performance in October 2003 along with a pay increase of twenty-five cents per hour.  Roe remained disgruntled about doing Clinique work and expressed her dissatisfaction in January 2004.  At this time, Lanham instructed both Roe and Anita Powell to help each other with work in the respective areas.  This instruction did not amount to a material adverse employment action because, as explained above, the requirement that Roe perform Clinique work in addition to Estée Lauder work did not constitute an adverse employment action.  Roe, moreover, does not allege that in or after January 2004, Lanham did not reprimand or otherwise respond to Roe's act of not performing Clinique work.  (Roe's depos., pp. 198-99).  The record thus lacks evidence showing any adverse employment action in or after January 2004.

Accordingly, the record fails to support the third element of Roe's prima facie case.

## 2.
## Roe's Prima Facie Case – Similarly Situated Employees

Defendant contends that Roe has not pointed to more favorable treatment of a similarly situated employee.  This contention is well taken.

To satisfy the fourth element of her prima facie case, Roe must present affirmative

evidence indicating that a similarly situated non-protected employee was treated more favorably. *See McDonnell Douglas*, 411 U.S. at 802; *see also Talley*, 61 F.3d at 1246.

Roe asserted in her answers to Defendant's Interrogatory answers that Nanette Rock and Amber Tilson were similarly situated employees. *See* Doc. #17 at 19.

To establish that either Rock or Tilson was similarly situated to her, Roe must demonstrate that either employee was similarly situated to her in all relevant respects. *See Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998). Rock's employment situation with Defendant is significantly different than Roe's. Rock holds a different position as a part-time Estée Lauder beauty advisor, than Roe, who is a counter manager. Rock reports to Roe.

With respect to Tilson, who was the Clinique counter manager, Roe testified that Defendant treated Tilson more favorably by permitting her to leave work early on occasion. (Roe's depos., p. 122). Roe, however, acknowledged that Brown did not deny her the opportunity to leave work early. *Id.* at 129. Roe also knew that Tilson was supposed to assist with Estée Lauder work. Although Roe never heard Brown or Latham instruct Tilson to help with Estée Lauder work, Roe knew they were supposed to help each other and Tilson did so on occasion. *Id.* at 130-31. A reasonable jury could only conclude that Defendant treated Roe and Tilson the same with regard to the instruction to help each other.

A review of the record regarding other counter managers does not reveal that Defendant treated any similarly situated employee more favorable than it treated Roe. First, as to Clinique counter manager Anita Powell, near the time Powell was hired, Lanham asked both Roe and Powell to help each other as necessary. *Id.* at 182, 197-99. Second, Roe cannot identify any

20

particular counter manager who worked for Defendant at WPAFB before Roe was hired, and she

relies on hearsay statements by Nanette Rock to support her contentions regarding how the

former counter managers were treated.  *Id*. at 121, 226-27.  Because Roe lacks personal

knowledge about the identity of another counter manager and because hearsay evidence may not

be considered on a motion for summary judgment, *see Sutherland v. Mich. Dep't of Treasury*,

344 F.3d 603, 619-20 (6th Cir. 2003), Roe has not shown that any former manager was similarly

situated to her or was treated more favorable than she was treated.

Roe asserts that counter managers at mall store locations were treated more favorably

than she was treated.  This assertion, however, is based on hearsay statements by mall-store

counter managers.  (Roe's depos., pp. 214-15).  These mall-store managers are also not similarly

situated to Roe because Lanham has no supervisory authority over them.  *Id*. at pp. 214-16.

Consequently, no inference of discrimination could arise from any treatment of the mall-store

counter managers more favorable than Roe's treatment, since the source of the treatment

(Lanham in Roe's case) was not the same.

Accordingly, Roe has not established the fourth element of her prima facie case of race

discrimination.

### 3.
### Conclusions

Because the legal standards for analyzing Roe's claims of race discrimination under Title

VII, §1981, and Ohio statutory law are essentially the same, *see Noble*, 391 F.3d at 720, and

because Roe's evidence does not support all the elements of a prima facie case of race

discrimination, summary judgment in Defendant's favor is warranted on these claims.

**B.      Roe's Claims of Racial and Retaliatory Harassment Lack Merit**

21

Defendant contends that Roe cannot demonstrate a prima facie case of racially hostile work environment because Roe's "generalized, conclusory assumptions and subjective beliefs that everything she experienced was because of her race is simply not sufficient to establish a prima facie case of hostile work environment based on race. Indeed, at no time did anyone from Estée Lauder make any comment to her regarding her race." (Doc. #17 at 30)(footnotes omitted).

Title VII generally prohibits employers from subjecting employees to a racially hostile or abusive work environment . *See Hafford v. Seidner,* 183 F.3d 506, 512 (6th Cir.1999). To establish a prima facie violation of Title VIV based on a racially hostile work environment, Roe must show, in part, that she was subjected to unwelcome harassment, that the harassment was based on her race, and that the harassment had the effect of unreasonably interfering with her work performance by creating an intimidating, hostile, or offensive work environment. *Newman v. Federal Exp. Corp.*, 266 F.3d 401, 405 (6th Cir. 2001). To show the existence of a racially intimidating, hostile, or offensive work environment, Roe must show that her work environment was both objectively and subjectively offensive. *Newman*, 266 F.3d at 405.

The Court considers the totality of the circumstances Roe faced including the frequency of the discriminatory conduct; its severity; whether it was physically threatening or humiliating, or involved mere offensive utterances; and whether it unreasonably interfered with Roe's work performance. *Newman*, 266 F.3d at 405 (quoting *Harris v. Forklift Sys., Inc*., 510 U.S. 17, 23 (1993). Simple teasing, offhand comments, and isolated incidents (unless extremely serious) fail to constitute a hostile or abusive work environment that violates Title VII. *Newman*, 266 F.3d at 405; *see Harris,* 510 U.S. at 21-22; *see also Williams v. General Motors Corp*., 187 F.3d

553, 560 (6th Cir. 1999).  Yet, "verbal conduct alone can be the basis of a successful hostile work environment claim." *Abeita v. TransAmerica Mailings, Inc.*, 159 F.3d 246, 251 (6th Cir. 1998)(quoting *Black*, 104 F.3d at 826).  Similarly, "[a] work environment viewed as a whole may satisfy the legal definition of an abusive work environment, for purposes of a hostile environment claim, even though no single episode crosses the Title VII threshold." *Williams*, 187 F.3d at 564.

These standards likewise apply to Roe's claim that Defendant's harassment violated Title VII by constituting retaliation.  To show that retaliatory harassment violated Title VII, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Burlington Northern & Santa Fe Railway Co. v. White*, __U.S. __, __, 126 S.Ct. 2405, 2415 (2006) (quoting in part *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)).  "The anti-retaliation provision seeks to prevent employer interference with 'unfettered access' to Title VII's remedial mechanisms....  It does so by prohibiting employer actions that are likely 'to deter victims of discrimination from complaining to the EEOC,' the courts, and their employers....  And normally petty slights, minor annoyances, and simple lack of good manners will not create such deterrence." *Burlington*, __U.S. __, 126 S.Ct. at 2415 (citations omitted).

Roe has not alleged facts sufficient to demonstrate that Defendant subjected her to a racially hostile or abusive work environment in violation of Title VII.  Roe does not allege that any employee of Defendant has made a comment to her regarding her race.  She does not allege that any employee of Defendant physically threatened or humiliated her.  She instead points to

23

Lanham's mere offensive utterance on one occasion when Lanham said that it was dumb to carry

a heavy box down the stairs.  When Roe then asked Lanham if she was calling Roe dumb,

Lanham "said no but use some common sense..."  (Roe's depos., p. at 172).  Nothing in these

comments directly referred to Roe's race or was otherwise of such severity that they rose to the

level of the objectively hostile.  Although these comments were doubtlessly upsetting to Roe,

these comments fall on the side of petty slights or petty indignities that Title VII does not

prohibit.  *See Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80 (1998)(Title VII

does not establish "a general civility code for the American workplace.").  Roe, moreover, does

not allege that Lanham or Brown made similar comments on other occasions.  Instead, these

were offhand comments that were isolated in occurrence and therefore did not occur with

sufficient frequency to rise above petty slights or indignities.

In addition, nothing in Roe's allegations, described previously, *supra*, §II, indicate the

occurrence of comments or conduct sufficiently severe and pervasive to create a racially hostile

or abusive work environment.  Roe's evidence concerns Brown or Lanham's decisions regarding

Roe's job duties, Roe's November 2003 job performance evaluation, Roe's medical leave of

absence, and the events after Roe returned from her medical leave of absence.  When Roe's

testimony about these events is accepted as true and viewed liberally in her favor, it is clear that

Roe was disgruntled and hurt by these events.  Yet, the record simply fails to contain a genuine

issue over whether, under the totality of the circumstances Roe faced, she was subjected to a

objectively hostile work environment.  Instead, a reasonable jury could only conclude that at

most that Roe was not subjected to racial comments or harassment that occurred with such

severity and frequency that she was forced to work in an objectively racially hostile or abusive

work environment.

To the extent Roe raises allegations of racial harassment concerning non-Estée Lauder employees at the WPAFB Exchange, she acknowledged during her deposition that she did not report these incidents to Brown or Lanham.  (Roe's depos., pp. 410-11).  She further acknowledged that she knew about Defendant's policy against workplace discrimination and harassment.  *Id*. at 145.  In addition to these undisputed facts, the record lacks any other evidence from which a reasonable juror could infer that Defendant knew or should have known about the alleged harassment by any non-Estée Lauder employee at the WPAFB Exchange.  Consequently, in this case, Defendant cannot be held liable for harassment committed by non-Estée Lauder employees at the WPAFB Exchange.  *See Burlington Industries, Inc v. Ellerth*, 424 U.S. 742, 765 (1998).

In addition, for the above reasons, no reasonable jury could conclude that Defendant subjected Roe to objective hostilely retaliatory harassment in violation Title VII.  In addition, the standards applicable under 42 U.S.C. §1981 and Ohio statutory law are essentially the same as those applicable to Roe's Title VII claims for racial harassment and retaliation.  *See McCombs v. Meijer, Inc*., 395 F.3d 346, 353 n.6 (6th Cir. 2005)("Ohio's statutory provision is almost identical to Title VII and has been analyzed using federal interpretation of Title VII.")(citing *Delaney v. Skyline Lodge, Inc.,* 95 Ohio App.3d 264, 642 N.E.2d 395, 399 (1994)); *see also Courtney v. Landair Transport, Inc*., 227 F.3d 559, 563 (6th Cir. 2000); *Jackson v. Quanex Corp*., 191 F.3d 647, 658 (6th Cir. 1999).

Accordingly, Defendant is entitled to summary judgment on Roe's claims of racial harassment and retaliation in violation of Title VII, 42 U.S.C. §1981, and Ohio statutory law.

### C.     <u>Plaintiff's Remaining State Law Claims</u>

Roe claims that Defendant breached a contract with her by instructing her to perform Clinique work, especially stocking Clinique products, in addition to her Estée Lauder work. This claim fails because (1) Roe is an at-will employee of Defendant; (2) there is no genuine dispute over the fact that Defendant never promised her that she would never have to perform Clinique work; (3) and Roe's written job description requires her to promote good working relationships and to encourage cooperative teamwork. *See* Roe's depos., pp. 40-47, 52-58. Of particular significance to Roe's breach of contract claims is her at-will employment status, which deprives her of the ability to point to a written contract setting the specific terms and conditions of her employment. *See Lautermilch v. Findlay City Schools*, 314 F.3d 271, 275 (6th Cir. 2003) "because Lautermilch did not enter into a written contract with the Findlay City Schools, he is an 'at will' employee.")(citing *Henkel v. Educ. Research Council of America,* 45 Ohio St.2d 249, 344 N.E.2d 118, 119 (Ohio 1976)). Because of this, Defendant could alter the terms of her employment without breaching any contract. *See Lake Land Emp. Group of Akron, LLC v. Columber*, 101 Ohio St.3d 242, 247 (2004).

Turning lastly to Roe's claims that Defendant violated public policy, she has not identified any source of a clear public policy other than the various state and federal statutes prohibiting employment discrimination and retaliation. Because Roe cannot survive summary judgment on her claims of employment discrimination and retaliation under Title VII, 42 U.S.C. §1981, and Ohio statutory law, and because she has not identified any other clear public policy that has been jeopardized by Defendant's actions, summary judgment is warranted on Roe's public policy claims as well. *See Knox v. Neaton Auto Products Mfg., Inc,.* 375 F.3d 451, 460

(6th Cir. 2004).

     Accordingly, Defendant is entitled to summary judgment on Roe's state law claims.

### IT IS THEREFORE RECOMMENDED THAT:

1.     Defendant's Motion For Summary Judgment (Doc. #17) be GRANTED;

2.     Plaintiff's Complaint (Doc. #1) be DISMISSED; and

3.     The case be terminated on the docket of this Court.

February 7, 2007

                    s/ Sharon L. Ovington
                      Sharon L. Ovington
              United States Magistrate Judge

### NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within ten days after being served with this Report and Recommendations.  Pursuant to Fed. R. Civ. P. 6(e), this period is extended to thirteen days (excluding intervening Saturdays, Sundays, and legal holidays) because this Report is being served by mail.  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within ten days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See United States v. Walters*, 638 F. 2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140 (1985).